Feordis and Annette Pearson, husband and wife, were indicted for the felony of child abuse, a violation of Ala. Code 1975, § 26-15-3. After a jury trial, they were convicted of the misdemeanor offense of endangering the welfare of a child, a violation of Ala. Code 1975, § 13A-13-6. They were sentenced to 225 days' imprisonment.
We reverse the convictions and render judgments of acquittal in favor of the appellants because the State's evidence was not sufficient, as a matter of law, for the jury to conclude beyond a reasonable doubt that the appellants were guilty.
 I
The State's evidence established that on September 16, 1990, the appellants were the natural parents of four children: Feordis, Jr., age 5; LaDonna, age 3; Casey, age 2; and Brittney, age 1. Mrs. Pearson, who was then 36 weeks pregnant, went into labor on September 16, 1990, and her husband took her to a Birmingham hospital, where she delivered a fifth child by Caesarean section the following day. Mrs. Pearson and her newborn son Brian remained in the hospital until September 20. During *Page 1121 
that three-day period, Mr. Pearson stayed with his wife in the hospital and the four older Pearson children stayed with relatives in Anniston. On September 20, the appellants returned home with their four-day-old son, stopping along the way to pick up their other four children and to have a prescription filled for Mrs. Pearson. Mrs. Pearson's obstetrician had prescribed Fiorinal with codeine to ease the discomfort caused by the Caesarean section incision.
The appellants and their five children spent the day at home, an apartment in a low-rent public housing project. The apartment included a kitchen and living room downstairs and two bedrooms and a bath upstairs. Mrs. Pearson gave her newborn a bottle about 10:00 p.m. and then put him and the older children down to sleep. The infant's bed was a playpen in the room with the four other children, who slept in bunk beds and another playpen. The appellants turned on a large window fan in the children's room, closed the door, and went to their own bedroom down a hall approximately six feet long. Mrs. Pearson took her prescribed medication, which had been labeled with a warning that it could cause drowsiness, and she and her husband went to sleep between 10:00 and 11:00 p.m. They did not hear the baby cry during the night, and they did not awaken until shortly before 7:00 a.m. the next morning.
When Mrs. Pearson went in to check on the children about 7:00 a.m., she found four-day-old Brian covered with fire ants. She took the baby to the bathroom to wash off the ants and she screamed for her husband. Mr. Pearson immediately took the infant to the emergency room of a local hospital.
Dr. Charlie B. Williams, Jr., the emergency room physician who treated Brian Pearson, testified that when he first saw the Pearson child, the infant was not breathing and had no pulse. "For all practical purposes the child was dead." R. 70. The baby was cold, pale, and had red ants crawling all over him. Dr. Williams testified that ants were present in the child's "ear canals, mouth. There were furrows eaten out of the child's scalp. Fingertips were eaten, and tips of the earlobes were eaten. . . . There were furrows eaten across the child's tips of its toes." R. 70-71. The physician described the following resuscitation efforts:
 "The child had to have an intubation, a tube placed down its throat through the trachea so that it could breathe. There were ants present in the trachea. It had to have an IV access. There was no pulse. We had to do a venous cut-down which requires dissecting into the groin down to a vein and inserting a catheter into the vein while CPR was in progress." R. 71.
The infant was eventually resuscitated and was transported by helicopter to the pediatric intensive care unit of Children's Hospital in Birmingham. There he was attended by Dr. James Royall, who testified that when he first observed Brian Pearson he concluded that the child was "unlikely to survive"; the baby's chances of dying were "greater than 90%." R. 185. The infant was not breathing on his own, had a very low blood pressure, and "had little or no evidence of brain function." R. 184.
Dr. Royall estimated that the baby had "thousands of ant bites." R. 188. The physician testified that because the case was "unusual" he did some research into the subject of fire ants and contacted two other doctors who had a particular interest or expertise in insect bites. R. 196. He learned that fire ants are
 "very aggressive. . . . They usually attack in groups. They sting multiple times. It's known that they will attack and kill small animals.
 "They have been reported to enter homes and attack people, but it's very rare. You have to look for it. There is a case from Tampa where a debilitated elderly woman where ants came in the home and she was stung thousands of times." R. 201-02.
Dr. Royall explained that an allergic reaction is the "main mechanism by which people can die from fire ant bites." R. 202. However, Dr. Royall gave his opinion that Brian Pearson did not have an allergic reaction *Page 1122 
to ant venom because that kind of reaction requires previous exposure to the venom and the making of antibodies to the venom. Instead, Dr. Royall came to the conclusion that the infant went into shock from "just the number of stings on [his] body." R. 203. "The ants attacked him, and they made him go into shock. That was the mechanism of injury." R. 205.
Acting on information received from a social worker at the Department of Human Resources, Lt. Gary Carroll of the Anniston Police Department went to the appellants' residence about noon on September 21, 1990. He observed "quite a few ants" around the back door of the apartment. R. 95. Later that afternoon, he returned with other officers to execute a search warrant at the residence. The officers were accompanied by DHR social worker Robyn Snider. Ms. Snider testified that the residence had a "very unpleasant" odor, like "dirty diapers [and] spoiled food." R. 256-57. Lt. Carroll described the condition of the apartment as follows:
 "[T]here was trash scattered around the kitchen. There was a lot of dirty dishes and things laying around. The whole floor was a rather messy condition. It was very unclean." R. 100.
Carroll saw a number of ants around a playpen and on a blanket in an upstairs bedroom. Samples of the ants were collected and sent to the entomology department at Auburn University.
Lt. Carroll took statements from the appellants on September 24, three days after the injury to Brian Pearson. Both said that they saw no ants inside the apartment on the day they brought Brian home from the hospital. C.R. 78, 94. They had seen ants previously and had "talked to [the] Housing Authority about it." C.R. 78. The apartment manager told them that the Housing Authority had previously sprayed for insects, but that practice was being discontinued, and any pest control would have to be paid for by individual tenants. C.R. 78. Mr. Pearson "sprayed Raid several times, trying to stop the ants, but they [were] never as bad as the day [that they found Brian covered with ants]." C.R. 78.
Arthur Gary Appel, an Auburn University professor of entomology who had conducted fire ant research, testified that the ants collected at the appellants' residence on September 21 were red imported fire ants. Dr. Appel described the habits of this variety of ant, specifically the worker-forager ants, which he said the specimens sent to him by the Anniston police department were. According to Dr. Appel, the worker-foragers are
 "A. . . . capable of recruiting more workers from the mound . . . if they find food, they can call back to the colony and recruit more workers to come and get the food. . . .
 "Q. [By assistant district attorney] You said 'call back.' How is that done?
 "A. It is done in one of two ways. The ants can either produce a chemical that calls the other workers towards it, or that worker can actually go back to the mound and physically contact other workers and bring them back.
 "Q. You mentioned foraging. Are these ants specifically attracted to different things?
 "A. These ants are considered quite omnivorous. They will eat anything edible and even some things that we don't consider edible.
"Q. Give us some examples.
 "A. They will eat meat. They will eat plant parts, . . . honey or honey dew, very sweet compounds. They will attack garbage, they'll swarm into garbage, looking for meat and sweets. They have been known to forage on animal waste in the yard; feces.
"Q. Could they be attracted to human waste?
"A. I don't see why not.
". . . .
 "A. The fire ants can set up mounds in yards, in electrical equipment and even, uncommonly, but even in a house.
 "Q. Would you say they're attracted to electrical equipment?
 "A. . . . [Y]es, they seem to be attracted to electrical equipment.
"Q. What other items would they be attracted to? *Page 1123 
 "A. Anything that is moist, so they would be attracted to moist areas, moist soil. They have been known to go down into wells and forage at the water line.
 "Q. With respect to humans and human residences, would they be attracted to sugar or syrup or kitchen items or foodstuffs?
"A. Yes.
"Q. Would they be attracted to mucus surfaces?
 "A. There is very good evidence from the literature that they are attracted to mucus membranes. . . .
 "Q. In your opinion, would that mean that a young animal or a young human that they could be attracted to?
"A. They could be attracted, yes.
 "Q. If they were to find a newly-born deer or human, what would be their behavior toward them?
"A. Generally, they would swarm —
 "Q. This is assuming there wasn't any hostile response by an object they had found. What would be their behavior?
 "A. Generally, they would swarm over it. I don't mean flying. Many ants would get onto the body and both lick and chew at the secretions, and depending on what the body was like, they might sting it or they might try to literally carve up the body and carry it away." R. 217-19.
On cross-examination by defense counsel, Dr. Appel stated that, depending upon how far away the worker-foragers were from their colony or mound, they could recruit other worker-foragers to exhaust a food source in "several hours or . . . several minutes." R. 228. He testified that by spraying an insecticide one could set up a barrier to prevent fire ants from foraging, but that was "probably something that not an average person would be trained to do." R. 287.
At the conclusion of the State's case, both appellants moved for a judgment of acquittal on the ground that the prosecution had failed to present a prima facie case of child abuse under Ala. Code 1975, § 26-15-3. R. 285-87. The trial court denied the motions without mentioning the possible applicability of any lesser included offense. At the conclusion of all the evidence, counsel for appellant Annette Pearson renewed his earlier motion for judgment of acquittal on the same ground. R. 462. The court again denied the motion without mentioning a lesser included offense. Then, after all parties had concluded their closing arguments, the court called a short recess. When court reconvened, counsel for appellant Annette Pearson stated the following:
 "[DEFENSE COUNSEL]: Judge, on behalf of Annette Pearson, it's our understanding that Your Honor is going to instruct on a lesser-included offense of endangering the welfare of a child, and we object to it. As grounds for our objection, we state the [of]fense of endangering the welfare of a child is not a lesser-included offense of the [crime] delineated in Title 26-15-3 of the Code of Alabama, that being the child abuse code section, and we object [to] the Court instructing the jury on it." R. 469.
Counsel for appellant Feordis Pearson joined in the foregoing objection. Neither attorney argued that the evidence was insufficient to present a jury question on endangering the welfare of a child, only that that crime was not an included offense of child abuse.
The Attorney General argues on appeal that the appellants did not preserve for our review the question of the sufficiency of the evidence of endangering the welfare of a child. While the appellants preserved the sufficiency issue with regard to child abuse, that issue is moot because they were not convicted of child abuse. The State contends that for the offense of which the appellants were convicted, endangering the welfare of a child, they did not challenge the sufficiency of the evidence. We do not agree.
The issue of evidentiary sufficiency was fairly raised by both appellants, was understood by the trial court, and was ruled on in post-trial proceedings. Rule 20.3(a), A.R.Crim.P., provides that
 "[a]fter a verdict or the entry of a judgment of conviction, the defendant may *Page 1124 
move for a judgment of acquittal. . . . It shall not be necessary to the making of the motion after a verdict or judgment of conviction that a similar motion have been made prior to the submission of the case to the factfinder."
See also Fortier v. State, 515 So.2d 101 (Ala.Cr.App. 1987), cert. denied, 484 U.S. 1043, 108 S.Ct. 776, 98 L.Ed.2d 862
(1988). Rule 20.3(c) contemplates that
 "[a] motion for judgment of acquittal may be made in addition to a motion for new trial . . . or a motion in arrest of judgment . . ., or may be joined with either of those motions as an alternative prayer for relief within the same motion." (Emphasis added.)
The Committee Comments to Rule 20.3(c) state that "the usual procedure will be to join in one motion the motion for judgmentof acquittal based on insufficiency of the evidence, and the motion for new trial based on other grounds." (Emphasis added.)
After the jury verdict convicting them of endangering the welfare of a child, both appellants filed post-trial motions, styled "Motion[s] for New Trial," requesting the court
 "to set aside the verdict and sentence in the above-styled cause and to render a judgment of acquittal . . . or to grant . . . a new trial, or in the alternative to set aside the sentence imposed in said cause and re-sentence the defendant." C.R. 38, 220 (emphasis added).
Both appellants alleged that the verdict was "contrary to the weight of the evidence in that the State failed to prove a prima facie case of willful child abuse." C.R. 38, 221. Although the appellants sought relief in the form of a "judgment of acquittal," which is based on insufficiency of the evidence, see Rule 20.3(c) (Committee Comments), they phrased their allegations in terms of the "weight" of the evidence as well as the failure of the State to prove a "prima facie case." Furthermore, their allegations regarding evidentiary weight and sufficiency related to the child abuse offense of which they were acquitted, rather than to the endangering offense, of which they were convicted.
Despite this confusion in terminology, it is apparent that the trial court understood the appellants' motions to present issues of both sufficiency and weight. It is also evident that the court denied the motions in regard to the offense for which the appellants were convicted because it found no merit to either issue. The trial court's order denying the motions for new trial reads, in pertinent part:
 "The Court further finds that the verdict in this case is not contrary to law and that the weight of evidence was sufficient to sustain the verdict in this case. . . .
". . . .
 "The Court finds that upon a review of the evidence presented, there was a rational basis for a verdict convicting the Defendants for endangering the welfare of a child." C.R. 45 (emphasis added).
This Court recognizes the difference between the sufficiency of the evidence and the weight of the evidence. A question of sufficiency is presented when the State fails to establish a "prima facie case," see C. Gamble McElroy's Alabama Evidence § 449.05 (4th ed. 1991), whereas a question of weight is presented when the State's evidence is palpably less persuasive than the defense evidence, see Parker v. State, 395 So.2d 1090,1103 (Ala.Cr.App. 1980), cert. denied, 395 So.2d 1103 (Ala. 1981).
 "[A] conviction rests upon insufficient evidence when, even after viewing the evidence in the light most favorable to the prosecution, no rational factfinder could have found the defendant guilty beyond a reasonable doubt. A reversal based on the weight of the evidence, on the other hand, draws the appellate court into questions of credibility. The 'weight of the evidence' refers to 'a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.' "
Tibbs v. Florida, 457 U.S. 31, 37-38, 102 S.Ct. 2211, 2216,72 L.Ed.2d 652 (1982) (quoting Tibbs v. State, 397 So.2d 1120, *Page 1125 
1123 (Fla. 1981)) (brackets in original; footnote omitted).
Although we recognize the distinction between sufficiency and weight, we acknowledge that the pleadings of lawyers and the opinions of judges often do not maintain that distinction with clarity. In fact, we recently observed that "the courts of this state have almost consistently employed the terms 'weight' and 'sufficiency' interchangeably and synonymously, e.g., Gantt v.State, 356 So.2d 707, 712 (Ala.Cr.App.), cert. denied,356 So.2d 712 (Ala. 1978), and on occasion, appear even to have treated the . . . issue . . . as a hybrid or mixed question involving both weight and sufficiency, see Ex parte Turner,455 So.2d 910 (Ala. 1984)." Ellis v. State, 570 So.2d 744, 755
(Ala.Cr.App. 1990). As the authors of W. Schroeder, J. Hoffman, R. Thigpen, Alabama Evidence § 14-2 (1987), observe:
 "Numerous cases purporting to deal with the sufficiency of the evidence state that a verdict of conviction should not be set aside unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence is so clearly against the verdict as to convince the reviewing court that the verdict is wrong and unjust. This statement confuses the standard of review on the question of the sufficiency of the evidence with the standard of review on the question of weight of the evidence. If the evidence is insufficient to support a conviction, a judgment of acquittal should be entered. If the evidence is sufficient to support a conviction, but the verdict is against the clear preponderance of the evidence, a new trial should be ordered."
Id. at 429 (emphasis in original) (footnotes omitted).
There is a widespread practice, among the bench and bar alike, of combining what should be separate tests for weight and for sufficiency into a confusing "blend" of terminology and criteria. Despite this practice, we believe the trial judge understood the appellants' post-trial allegations to have raised questions of both weight and sufficiency before it ruled, in fact, on both issues. We therefore find that the sufficiency of the State's evidence of endangering the welfare of a child is properly before us for review. Cf. Ex parte Webb,586 So.2d 954, 956-57 (Ala. 1991) (when trial court understands the basis for defense counsel's objection, a reviewing court should not be "too strict in its application of the waiver principle"); Ex parte McCall, 594 So.2d 628 (Ala. 1991) (requiring literal compliance with procedural rule when court has been made aware of basis of defense request "would be to elevate form over substance").
The trial court specifically ruled on the sufficiency of the State's evidence of the endangering offense when it found that "there was a rational basis for a verdict convicting the Defendants for endangering the welfare of a child." C.R. 45. This finding represents the rejection of a sufficiency, not a weight, argument. "A reversal based on the insufficiency of the evidence . . . means that no rational factfinder could have voted to convict the defendant." Tibbs v. Florida,457 U.S. at 41, 102 S.Ct. at 2218.
We assume that the crime defined in § 13A-13-6 is a lesser included offense of that defined in § 26-15-3. However, we need not specifically address that question because the State's evidence was legally insufficient to prove either offense, and we reverse on the basis of evidentiary insufficiency. Section26-15-3 provides:
 "A responsible person, as defined in section 26-15-2 [to include a parent], who shall torture, willfully abuse, cruelly beat or otherwise willfully maltreat any child under the age of 18 years shall, on conviction, be punished by imprisonment in the penitentiary for not less than one year nor more than 10 years."
Section 13A-13-6 provides, in pertinent part, that
 "(a) A man or woman commits the crime of endangering the welfare of a child when:
". . . .
 "(2) He or she, as a parent . . . of a child less than 18 years of age, fails to exercise reasonable diligence in the control of such child to prevent him or *Page 1126 
her from becoming a 'dependent child' . . . as defined in section 12-15-1."
The relevant portions of § 12-15-1 provide that a "dependent child" is a child
 "d. Whose home, by reason of neglect, cruelty or depravity on the part of his parent . . . is an unfit and improper place for him; or
 "e. Whose parent . . . neglects or refuses, when able to do so or when such service is offered without charge, to provide or allow medical, surgical or other care necessary for such child's health or well-being; or
 "f. Who is in such condition or surroundings or is under such improper or insufficient guardianship or control as to endanger his morals, health or general welfare; or
 "g. Who has no proper parental care or guardianship; or
 "j. Who is physically, mentally or emotionally abused by his parents, . . . or who is without proper parental care and control necessary for his well being because of the faults and habits of his parents, . . . or their neglect or refusal, when able to do so, to provide them; or
 "k. Whose parents . . . are unable to discharge their responsibilities to and for the child; or
 "m. Who for any other cause is in need of the care and protection of the state; and
 "n. In any of the foregoing, is in need of care or supervision."
§ 12-15-1(10) (Supp. 1991).
Reduced to the simplest terms relevant here, the child abuse offense requires intentional conduct ("willfully abuse . . . or otherwise willfully maltreat"), while the endangering offense requires negligent conduct ("fails to exercise reasonable diligence"). The State did not prove a prima facie case because it did not establish that Brian Pearson's injuries were caused either by the willfulness of or by the negligence of his parents.
The State's theory of the case was that the appellants were negligent in their housekeeping practices — as shown by the presence of dirty dishes in the sink, spilled food on the counters, a soiled diaper on the floor of the children's room, and an unpleasant odor permeating the apartment — and in their sleeping arrangements — as evidenced by the fact that they put a newborn infant to bed in the same room with four preschoolers, closed the door, retired to their own room, and slept until morning. Even if the foregoing evidence constituted negligent parenting per se, there is no rational basis for the conclusion that this negligence was the cause-in-fact of Brian Pearson's injuries.
The victim's injuries "must have ensued as the result of the act of the person sought to be charged." Holsemback v. State,443 So.2d 1371, 1381 (Ala.Cr.App. 1983) (quoting F. Wharton,The Law of Homicide, § 44 (1907)) (emphasis added). Section13A-2-5(a), Ala. Code 1975, provides that "[a] person is criminally liable if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was sufficient to produce the result and the conduct of the actor clearly insufficient." The Commentary to § 13A-2-5 explains that
 "this section is a modified 'but for' test, with an express exclusion of those situations in which the concurrent cause was clearly sufficient to produce the result and the defendant's conduct clearly insufficient. . . . If the actual result is not within the contemplation of the actor, or within the area of risk of which he should have been aware, he is not deemed to have 'caused' the result. But if the difference is only one concerning which person or what property would be affected by defendant's act, or one of the degree of harm which would result, he is still held to have 'caused' the result."
The accused's conduct is not the cause-in-fact of an injury if there was an unforeseen "supervening, intervening cause sufficient to break the chain of causation." Lewis v. State,474 So.2d 766, 771 (Ala.Cr.App. 1985).
In Lewis, the victim shot himself after having played Russian roulette earlier in *Page 1127 
the day with the accused. The accused was charged with murder in connection with the victim's death and was convicted of criminally negligent homicide. In reversing that conviction, this Court determined that the victim's conduct was a "supervening, intervening cause sufficient to break the chain of causation," id., because it occurred after the Russian roulette game had ended and the accused had put the gun away and left the room. We held that "[e]ven though the victim might never have shot himself in this manner if the appellant had not taught him to play Russian [r]oulette, we cannot say that theappellant should have perceived the risk that the victim wouldplay the game by himself." Lewis, 474 So.2d at 771 (emphasis added).
As Lewis illustrates, foreseeability is the key issue in a causation inquiry. The "controlling question" is "whether the ultimate result was foreseeable to the original actor."Henderson v. Kibbe, 431 U.S. 145, 151 n. 9, 97 S.Ct. 1730, 1735
n. 9, 52 L.Ed.2d 203 (1977). If the accused "should have perceived" that his own conduct would concur with another cause to bring about the injury to the victim, then the other cause is concurrent, not supervening. See Shirah v. State,555 So.2d 807, 812-13 (Ala.Cr.App. 1989) (conduct of accused, who supplied morphine to victim, was the cause-in-fact of victim's death from overdose of Secobarbital and morphine combined). On the other hand, a supervening cause "breaks the chain of causation" precisely because it is not a reasonably foreseeable result of the accused's conduct. Lewis, 474 So.2d at 771.
In 1 W. LaFave A. Scott, Substantive Criminal Law, § 3.12 (1986), the authors discuss two types of intervening causes, namely: those which are "coincidences" and those which are "responses" to the accused's conduct:
 "As might be expected, courts have tended to distinguish cases in which the intervening act was a coincidence from those in which it was a response to the defendant's prior actions. An intervening act is a coincidence when the defendant's act merely put the victim at a certain place at a certain time, and because the victim was so located it was possible for him to be acted upon by the intervening cause. The case put earlier in which B, after being fired upon by A, changed his route and then was struck by lightning is an example of a coincidence. . . . [I]t is important to note that there may be a coincidence even when the subsequent act is that of a human agency, as where A shoots B
and leaves him lying in the roadway, resulting in B being struck by C's car; or where A shoots at B and causes him to take refuge in a park, where B
is then attacked and killed by a gang of hoodlums.
 "By contrast, an intervening act may be said to be a response to the prior actions of the defendant when it involves reaction to the conditions created by the defendant. The most obvious illustrations are actions of the victim to avoid harm, actions of a bystander to rescue him, and actions of medical personnel in treating the victim. But, while a response usually involves a human agency, this is not necessarily the case; infection of a wound inflicted by the defendant may be said to be an instance of germs responding to the victim's condition.
 "As common sense would suggest, the perimeters of legal cause are more closely drawn when the intervening cause was a matter of coincidence rather than response. There is less reason to hold the defendant liable for the bad results when he has merely caused the victim to be at a particular place at a particular time, than when he has brought other agencies into play in response to a danger or injury. Thus — though the distinction is not carefully developed in many of the decided cases — it may be said that a coincidence will break the chain of legal cause unless it was foreseeable, while a response will do so only if it is abnormal (and, if abnormal, also unforeseeable). If A shoots B and leaves him disabled and then C runs over B with his car (coincidence), the question is whether A could not have reasonably foreseen this possibility; if A shoots B and then Dr. C gives B improper medical treatment (response), *Page 1128 
the basic question is whether the treatment was abnormal (generally, negligent medical treatment is not so viewed). If A shoots B and B is taken to the hospital, where he comes into contact with some communicable disease which causes his death (coincidence), A is not guilty of murder unless this was foreseeable (unlikely, unless it was generally known that there had been an outbreak of this disease); if instead B's wounds became infected and he died (response), A is guilty of murder (infection not abnormal)."
Id. at 406-07 (emphasis in original).
Following the LaFave and Scott analysis, it is doubtful whether the State's evidence established that the fire ant attack on Brian Pearson was anything other than a "coincidence," i.e., that the appellants "merely put the victim at a certain place at a certain time, and because the victim was so located it was possible for him to be acted upon by the intervening cause [fire ants]." Under this view of the evidence, the appellants were guilty of endangering the welfare of the victim only if the State established that the fire ant attack was foreseeable.
The prosecution established that the appellants had seen ants at some unspecified time before September 20-21, had "talked to the Housing Authority about it," and had "sprayed Raid several times, trying to stop the ants." However, the State presented no evidence that the appellants knew or should have known of the potential danger of a fire ant attack on their sleeping infant on the day in question. In fact, the State's only evidence on this point was that the appellants had seen no ants inside the apartment on the day they brought their child home from the hospital.
Moreover, the State's theory of the case was that the fire ant attack was not just a coincidence, but rather a "response to the defendant's prior actions," because it "involve[d] reaction to the conditions created by the defendant." Under that view of the evidence, the appellants were guilty of endangering the welfare of the victim only if the fire ant attack was both "normal" and foreseeable. The State's evidence unquestionably established that the fire ant attack on Brian Pearson was "abnormal." The statement given by appellant Feordis Pearson acknowledged that he had seen ants before, but they were "never as bad as the day [that they found Brian covered with ants]." The State's expert witnesses, without exception, characterized the attack on Brian Pearson as "unusual" or "very rare."
Applying the LaFave and Scott analysis to the causation principles of § 13A-2-5, we ask the following questions: (1) Was it normal, and reasonably foreseeable, that the appellants' failure to observe good housekeeping practices would result in the attraction of thousands of fire ants to the body of their newborn child, asleep in a second floor bedroom? The answer to this is clearly no. While the attraction of ants to an unsanitary environment is "normal," the State's own evidence established that the attraction of — and attack by — thousands of ants on a sleeping infant was "abnormal." (2) Was it normal and reasonably foreseeable that the appellants' having put their four toddlers to bed in the same room with their newborn infant would result in an attack on the infant by hordes of carnivorous insects? Obviously, again the answer is no. Those sleeping arrangements entailed a risk, if anything, that the newborn would be injured by the toddlers, not by the insects. "If the actual result is not within the contemplation of the actor, or within the area of risk of which he shouldhave been aware, he is not deemed to have 'caused' the result." Commentary to Ala. Code 1975, § 13A-2-5, at 30 (emphasis added). (3) Was it normal and reasonably foreseeable that the appellants' closing the door to the infant's bedroom and to their own bedroom six feet away, and then sleeping through the night would result in the appellants' unawareness of, and inability to respond to, an assault on the infant by swarming fire ants? Once again, the answer must be no. The injuries which befell this infant were not within the area of risk of which the appellants should have been aware, and their merely sleeping through the night while those injuries occurred was too speculative a basis upon *Page 1129 
which to predicate criminal liability. Compare Graves v.Commonwealth, 273 S.W.2d 380 (Ky. 1954).
In Graves, the accused was a drunk driver who ran his truck into a ditch in front of the victim's house. He went to the victim's house to ask for help and, once inside, began to curse loudly and cause a disturbance. The victim awoke her husband and told him "[the accused] just tore me all to pieces. I am going to have to have a doctor." 273 S.W.2d at 381. The victim's husband, stating that his wife was sick and that he intended to call a doctor, ordered the accused to leave. The accused left, but soon returned. He pounded on the door, kicked on the side of the house, and rapped on the victim's bedroom window. The victim suffered a cerebral hemorrhage and died three days later. Reversing the accused's conviction for involuntary manslaughter, the Kentucky Court of Appeals held:
 " 'It is, at least, speculative to say that the act of the defendant in this case was sufficiently proximate to impose criminal responsibility upon him for the unfortunate death. We are of the opinion, therefore, that the court should have directed an acquittal.'
". . . .
 "Although [the accused's] conduct was completely reprehensible and in violation of every concept of decency and good manners, we are forced to the conclusion that the evidence is not sufficient to sustain a conviction for involuntary manslaughter."
273 S.W.2d at 382.
Viewing the State's evidence in this case in its most favorable light and allowing for all reasonable inferences arising therefrom, it is clear that the evidence was wholly insufficient to establish that the appellants "fail[ed] to exercise reasonable diligence" to prevent their child from undergoing the horrendous injuries he suffered.
" 'Insufficient evidence is, in the eye of the law, no evidence.' " Ex parte Mauricio, 523 So.2d 87, 93 (Ala. 1987) (quoting Cardozo, J., writing for the court in People v. Galbo,218 N.Y. 283, 293, 112 N.E. 1041, 1045 (1916)). The State presented no evidence of the appellants' guilt, and they are due to have their convictions reversed and judgments of acquittal rendered in their favor.
REVERSED AND RENDERED.
PATTERSON, P.J., and TAYLOR and McMILLAN, JJ., concur.
MONTIEL, J., dissents with opinion.