Alvin Ronald Lewis was indicted for murder in violation of §13A-6-2, Code of Alabama 1975. At the conclusion of the State's evidence, the trial judge granted the appellant's motion for judgment of acquittal as to the offenses of murder and manslaughter. The case was then submitted to the jury on the charge of criminally negligent homicide. The jury found the appellant "guilty" and he was sentenced to twelve months' imprisonment in the county jail.
Linda Sanders testified that on May 30, 1983, she and her four children lived in London Village Mobile Home Park. Her son, Damon Sanders, is the victim in this case and was fifteen years old at the time of his death. Sanders said her son knew the appellant because he lived in London Village with one of her son's friends, Paul Schmuch.
Jo Ann Kennedy stated that, on the day in question, she lived at Spring Lake Manor Apartments and was dating the appellant. At approximately 4:00 on that afternoon, the appellant came to her apartment, where Kennedy was entertaining some friends. He became upset and left.
Around 8:00 p.m., the appellant and the victim came over to her apartment in the *Page 768 
appellant's truck. The appellant told Kennedy that he and the victim had been playing Russian Roulette. He demonstrated to her how they were playing this infamous "game." The appellant said that the victim was upset because he had broken up with his girl friend.
Kennedy and the appellant then spoke on the phone about an hour later. The appellant again said something about playing Russian Roulette. She heard a clicking noise over the phone. The appellant told her there was only one bullet and it wasn't in the gun. Kennedy told the appellant to put the gun up. The conversation ended at this point because Kennedy went to the store.
When Kennedy returned from the store around 9:30, she called the appellant. The two talked for a while and the appellant changed phones and went into the bedroom. A few minutes later the appellant said, "I've got to go, I've got to go, I've got to go, something's happened." (R. 33). Kennedy tried to call back but the phone was busy.
A while later, the appellant came to her apartment and she would not let him in. The appellant told her that the victim "had blew his brains out" (R. 30). She told him to call an ambulance and the appellant left.
Joyce Harper stated that on May 30, 1983, she also lived in London Village. At approximately 10:00 on this night, she and her husband were walking by Paul Schmuch's trailer. Harper looked in and saw the victim sitting on the sofa holding a gun in his hand. She saw the victim spin the chamber and heard a "whirr". When Harper and her husband were past Schmuch's trailer, Harper thought she heard a shot. Her husband told her it was a firecracker.
Treva Owens, Schmuch's girl friend, stated that she knew the appellant because he lived with Schmuch. On May 30, 1983, she lived in the same apartment complex as did Kennedy. At approximately 11:00 p.m. on that night, the appellant came to her apartment. He told her that he needed Schmuch's car because he had run out of gas. Owens told him that she'd take him to get gas.
On the way to get gas, the appellant said that the victim had shot himself in Schmuch's trailer. Owens asked if he'd called the ambulance and police. The appellant replied that he hadn't and that he'd taken the body to some woods.
After they got the gas, Owens took the appellant back to his truck. She told him to go get the victim, take him back to Schmuch's trailer and call the police. He stated that he would do so.
Thomas Hugh Holmes stated that some time during the week before the victim's death he and the victim went to Schmuch's trailer and watched television with the appellant and the appellant's brother. At some point, the appellant got a pistol and he and his brother played Russian Roulette. Holmes said that the appellant would take his turn, hand the gun to the victim and then the appellant's brother would take his turn. The gun had only one bullet in it. After several rounds of the "game," the appellant unloaded the gun and put it away.
Jana Mann testified that she was employed at the J.J. Food Store in Trussville on May 30, 1983. At approximately 8:00 p.m., the appellant came in the store. He was drunk and told her he was going to a fight. He then lifted up his shirt and there was a gun tucked in his belt. The appellant then left the store and the victim came in. A short while later, the victim left the store and the victim and the appellant drove away in the appellant's truck.
Nelson Byess, an investigator with the Trussville Police Department, testified that, when he arrived at Schmuch's trailer on the night in question, he saw a body lying in the back yard. The victim had suffered a gunshot wound to the temple and there was a gun in his hand. Byess then went into the living room and gave the appellant his Miranda rights. The appellant then waived those rights and made a statement. The following excerpt from *Page 769 
the transcript is the statement that the appellant gave that night:
 "A `Okay. Approximately 1:30 a.m., May 30th, Alvin Ronald Lewis made out the following statement at his residence, 1917 London Village Drive in Birmingham. Or Birmingham mailing route. I had been riding my bike, shooting my gun and drinking beer with Damon. Went by Jo Ann's house and came back to the trailer. I put the gun back into Paul's closet and was talking to Jo Ann on the phone in my bedroom. I heard a crack noise and walked into the living room. I said `I have got to go, something terrible has happened.' I hung up, I went to pieces. Damon was sitting on the couch with his head slumped against his chest, blood was running down his face into his shirt. His arms was across his lap, he was holding the gun. I took the gun and laid it on the table, then I got a towel and wrapped it around his head. I picked him up and carried him and put him into the truck. I drove over behind Thelma's where the concrete trucks dump and laid Damon on some brush. Then I was driving down 11, which is U.S. 11 Highway, when I noticed Damon's shirt and towel in the seat. I turned toward the trailer park across the road. I throwed them into the woods. I then drove over to Jo Ann's apartment. We had been fighting earlier and she wouldn't let me in and said she didn't believe me. I went down to Kathy's apartment and asked her — oh — `he stopped and then said Oh, after I left Jo Ann's I drove to Pineview Street and run out of gas. I walked back to the apartment, Kathy's apartment and asked Kathy to take me to get gas. She said she couldn't because her kids were asleep. I got real mad and beat my fist against the wall. I busted my knuckles. Kathy told me to leave or she would call the police. I went over to Treva's. Treva is Paul's girl. She was carrying me to my truck, I told her about Damon. She told me to go get Damon and carry him back to the trailer and then call the police or that she would call them. I went and got Damon and carried him back to the trailer and laid him in the backyard. I wiped off the gun, then fired it one time into the ground. I put the gun in Damon's hand then called you all.' At that time I asked him `Why he did it?' And he stated `I just went to pieces, I was scared, I didn't know what to do.'" (R. 121-122)
Following the statement, the appellant took Byess to where he had taken the body and showed him where he threw the victim's shirt and the towel into the woods. Byess collected several items of evidence at these locations.
Sharon Clay testified that she lived with the victim's family on May 30, 1983. That morning she witnessed a conversation between the victim and the appellant. Following the conversation, she said that the victim was mad.
Jerome Lift, the Assistant Coronor Medical Examiner for Jefferson County, testified that he performed an autopsy on the victim. His examination revealed that the victim had sustained a gunshot wound to the right side of the head at the level of his ear. Due to the disposition of gunpowder particles and smoke stain, he concluded that the gun was in close contact to the victim's head when it was fired. Lift stated that the cause of death was a gunshot wound to the head but he was unable to determine the manner of death. He testified that the wound was absolutely characteristic of a self-inflicted wound and that it was not consistent with any homicide wound he had ever seen.
Paul Schmuch testified that the appellant lived with him in his trailer prior to the night in question. Schmuch stated that the gun which killed the victim was his and that he kept it in his closet.
Schmuch was in Florida on this tragic night and when he returned he asked the appellant what had happened. The appellant told him that the gun was not loaded when he and the victim were "playing" with the gun. *Page 770 
 I
The appellant urges this court to reverse his conviction on the ground that his motion for judgment of acquittal should have been granted because there was not sufficient evidence presented at trial to sustain his conviction of criminally negligent homicide. He further contends that his acts were not the proximate cause of the victim's death. Since these issues are so closely related, we will consider them together.
The appellant was convicted of the offense of criminally negligent homicide. "A person commits the crime of criminally negligent homicide if he causes the death of another person by criminal negligence." Ala. Code, § 13A-6-4 (a) (1975). "A person acts with criminal negligence with respect to a result or a circumstance which is defined by statute as an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." Ala. Code, § 13A-2-2 (4) (1975).
The relevant evidence to this problem can be stated briefly. The victim had been present when the appellant and his brother played Russian Roulette with a loaded gun some time during the week prior to the victim's death. The appellant and the victim had played Russian Roulette on the day of the victim's death. It is unclear whether the gun was loaded or not during this time but there was some evidence that it was not. After the two finished playing the game, the appellant put the gun away. Later, the victim was seen alone holding a gun and spinning the chamber. A few minutes later, a noise which sounded like a gunshot was heard. At approximately the same time, the appellant ended a phone conversation because "something's happened." The coroner testified that the victim's wound was typical of a self-inflicted gunshot wound.
The evidence is clear that the deceased either committed suicide or fell victim to an unfortunate misadventure. Therefore, this Court is faced with a different question. "When may one human being be held criminally liable for the self-destruction of another?" Brenner, Undue Influence in theCriminal Law: A Proposed Analysis of the Criminal Offense of"Causing Suicide"[1] 47 Albany L.Rev. 62, 63 (1982). "The problem lies, of course, in determining when, and if, an accused did in fact cause his alleged victim to commit suicide. This difficult determination requires proof that the suicide was caused by the accused's actions and was not the result of the victim's own free will." Brenner, supra at 63.
In Alabama, "[a] person is criminally liable if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was sufficient to produce the result and the conduct of the actor clearly insufficient." Ala. Code, § 13A-2-5 (a) (1975).
Clearly, the problem encountered in this case is causation. The State contends that the appellant's acts were the proximate cause[2] and the cause in fact[3] of the victim's death. The basis of the State's contention is that the victim would not have killed himself playing Russian Roulette if the appellant had not "directed, instructed and influenced" him to play the game and that the appellant should have *Page 771 
been aware of the risk that the victim might be killed playing Russian Roulette by himself when he directed, instructed and influenced the victim to play the game.
If the victim had shot himself while he and the appellant were playing Russian Roulette, or if the appellant was present when the victim was playing the game by himself, the appellant's conduct of influencing the victim to play would have been the cause-in-fact and the proximate cause of the victim's death. However, the key is the appellant's presence at the time the victim shot himself. See Brenner, supra at 84-85. However, the evidence in the case at bar indicates the appellant was not present when the victim shot himself.
It also seems clear that the appellant would be responsible for the victim's death if he had left the room while the victim was still playing the game because he should have perceived the result. But, the evidence reveals that the appellant had put the gun away after they finished playing the "game."
A determination as to whether the conduct of a person caused the suicide of another must necessarily include an examination of the victim's free will. Cases have consistently held that the "free will of the victim is seen as an intervening cause which . . . breaks the chain of causation." Brenner, supra at 83. Therefore, the crux of this issue is whether the victim exercised his own free will when he got the gun, loaded it and shot himself. We hold that the victim's conduct was a supervening, intervening cause sufficient to break the chain of causation.
Even though the victim might never have shot himself in this manner if the appellant had not taught him to play Russian Roulette, we cannot say that the appellant should have perceived the risk that the victim would play the game by himself or that he intended for him to do this.
This case presents a tragic situation and we do not condone the appellant's conduct, in any manner. However, the causal link between the appellant's conduct and the victim's death was severed when the victim exercised his own free will.
Therefore, for the reasons shown this case must be reversed and this cause rendered.
REVERSED AND RENDERED.
TAYLOR, PATTERSON and McMILLAN, JJ, concur.
BOWEN, P.J., concurs in result only.
[1] According to the author, four states have enacted statutes which provide that "causing suicide" is a type of homicide. Even though Alabama does not currently have such a statute, the theory behind these statutes is helpful in our analysis of the case at bar.
[2] "In order to establish the cause of a death for which the defendant may fairly be held responsible, the death must have resulted in a manner similar enough to what the defendant had intended." Brenner, supra at 78.
[3] "For the conduct to be the cause-in-fact of death, it must have been `an antecedent but for which the result . . . would not have occurred.'" Brenner, supra at 78.