Rel: December 19, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2025-2026

_____

### SC-2025-0213

_____

**Ex parte Michael Timothy Huff**

**PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS**

**(In re: Michael Timothy Huff**

**v.**

**State of Alabama)**

**(Russell Circuit Court: CC-23-305 and CC-23-549; Court of Criminal Appeals: CR-2023-0983)**

PER CURIAM.

WRIT QUASHED. NO OPINION.

Shaw, Wise, Bryan, and Mendheim, JJ., concur.

Parker, J., concurs specially, with opinion.

Cook, J., dissents, with opinion, which Stewart, C.J., and Sellers, J., join.

McCool, J., recuses himself.

PARKER, Justice (concurring specially).

I agree that we should quash the writ as improvidently granted.

Our Court granted review to resolve a material (and narrow) question of first impression relating to the mental-culpability element of reckless manslaughter. Ala. Code 1975, § 13A-6-3(a)(1). That question conceded Michael Timothy Huff's awareness of his wife Rhonda Crute's "previous instances of violence," her "documented mental issues," and that she was high on methamphetamine when he left her alone with his ailing sister, Beverly Dunn, for those 22 fateful minutes on February 9, 2023. Petition at 3. The linchpin of the question, rather, was its premise that Crute had shown "no intention" or "signs" that she would harm Dunn before Huff left the two alone.[1] In those circumstances, did Huff

---

[1] The question presented in Huff's petition for certiorari was actually premised on the absence of signs that Crute might <u>kill</u> Dunn if the two were left alone. Petition at 3. But in my view, it makes no difference whether Crute was more or less likely to murder Dunn or, instead, whether Crute was merely capable of hurting Dunn in some less dramatic way. For one thing, whether Huff could reasonably have foreseen Dunn's death (as opposed to mere injury) concerns the causation element of reckless manslaughter, not the mental-culpability element. <u>Cf.</u> <u>Grant v. State</u>, 324 So. 3d 887, 898 (Ala. Crim. App. 2020). And our Court specifically declined to review any question related to that element of reckless manslaughter. <u>See</u> this Court's May 28, 2025, order (limiting review to "Issue I," mental culpability). What is more, even in a causation analysis, the foreseeability of the "<u>degree</u> of harm" appears to be

act recklessly in leaving Dunn alone with Crute? To put it more precisely, was Huff "aware of" and did he "consciously disregard[]" a "substantial and unjustifiable risk" that Crute would harm Dunn? Ala. Code 1975, § 13A-2-2(3) (defining "recklessly").

There are at least two reasons why this case proves to be a poor vehicle for answering that question.

First, Huff's framing of the question discounts evidence that he knew his wife was armed at that critical moment when he left Dunn's apartment. At trial, Crute acknowledged that she "always carried [a] knife with [her]." Crute further acknowledged that she carried a knife with her "every time" she left the couple's home. From that testimony, the jury could rationally have believed that Huff knew not only that his wife was high, violent, and mentally ill when he left her alone with Crute but also that she was carrying a knife. Evidence of a person's habit can validly prove that person's conduct "on a particular occasion." Rule 406, Ala. R. Evid.

---

immaterial if <u>some</u> harm was foreseeable. Commentary to § 13A-2-5, Ala. Code 1975 (emphasis added).

Second, and more importantly, the question discounts Huff's own statements that he was aware of and consciously disregarded a substantial and unjustifiable risk of Crute harming Dunn. In a Mirandized statement at the police station describing the moments before he left Dunn's apartment, Huff said: "Every time I looked at [Crute] she had a wild look on her face." In that same interview, Huff told police that Crute "seemed crazy before he left" Dunn's apartment. He also told police: "I shouldn't have left [Crute] there after I saw her giving [Dunn] these evil looks." Of course, this evidence may be subject to multiple, competing interpretations. And of course, other evidence in the record may point in different directions. But weighing the evidence is the jury's job, not ours. Huff's statements are at least legally sufficient to support the mental-culpability element of his reckless-manslaughter conviction, especially when viewed in the light most favorable to the jury's verdict. Cf. Ex parte Stewart, 900 So. 2d 475, 477 (Ala. 2004).

Huff's statements -- his admissions, really -- also mean that the question is not truly a "material question … of first impression" warranting our Court's discretionary review. Rule 39(a)(1)(C), Ala. R. App. P. That is because when the facts and circumstances of a criminal

5

offense are "inconclusive," this Court has long held that a defendant's "admissions or confession" may "aid[]" the jury, allowing it to convict "beyond a reasonable doubt, and so to support a conviction, although such facts and circumstances, standing alone, would not thus satisfy [that standard]." Bridges v. State, 284 Ala. 412, 417-18, 225 So. 2d 821, 826 (1969) (citing cases). As I see it, a reviewing court can and should resolve this case through a straightforward application of that principle with no need to further develop the law.

At the end of the day, this case does not fairly present the question on which this Court granted review, let alone a material question of first impression. In these circumstances, the most prudent course is to quash the writ and allow the Court of Criminal Appeals' decision to stand as the final word in this matter.

COOK, Justice (dissenting).

On February 9, 2023, Michael Timothy Huff went to visit his 74-year-old sister, Beverly Dunn, in Phenix City.  Dunn had just been released from the hospital after a fall and was having a hard time getting around, so Huff stopped by to see if she needed anything.

Huff decided to bring his wife, Rhonda Crute, with him that day. As explained below, although Crute had a history of violence, substance abuse, and mental-health issues, there was no evidence indicating that she had previously expressed any hostility or violence toward Dunn or had previously made any threats against her at any time.  There also was no evidence indicating that Crute showed any hostility or violence toward Dunn while Huff was present with the two of them on that day.

At some point during their visit, Huff offered to pick up food for Dunn at a local fast-food restaurant, leaving Crute alone with her for approximately 22 minutes. While he was away, Crute repeatedly stabbed Dunn, resulting in her death. Crute later pleaded guilty to Dunn's murder and is now in prison.

Although Huff was not present when Crute killed Dunn, he was nevertheless charged with, and later convicted of, (1) reckless

manslaughter, see § 13A-6-3(a)(1), Ala. Code 1975, and (2) first-degree hindering prosecution, see § 13A-10-43, Ala. Code 1975, over Dunn's death. He was then sentenced as a habitual felony offender to concurrent terms of life imprisonment for the reckless-manslaughter offense and to 99 years' imprisonment for the hindering-prosecution offense.

Huff appealed and the Court of Criminal Appeals affirmed both of his convictions and resulting sentences by an unpublished memorandum. See Huff v. State (No. CR-2023-0983, Dec. 20, 2024), ___ So. 3d ___ (Ala. Crim. App. 2024) (table). However, the vote was divided 3-2 on the reckless-manslaughter conviction, with Presiding Judge Windom and then-Judge McCool dissenting. Huff thereafter petitioned this Court for a writ of certiorari to review the Court of Criminal Appeals' decision.

This Court granted certiorari review to consider only the propriety of Huff's reckless-manslaughter conviction and to specifically consider, as a material question of first impression, whether a defendant can be independently convicted of reckless manslaughter under § 13A-6-3(a)(1) even though he or she is not the actual person who committed the act that resulted in a victim's death. Today, our Court quashes the writ, without an opinion. For the reasons explained below, I respectfully

8

dissent.

<u>Facts and Procedural History</u>

The evidence presented during Huff's trial showed that on February 9, 2023, police were dispatched to Dunn's apartment in Phenix City. Officer Tommy Pell of the Phenix City Police Department testified that, when he entered the apartment, he discovered a "female laying face down with her feet partially underneath a recliner." He said that she appeared to have knife wounds to her head and her back and that there was a great deal of blood around her body.

Dunn's neighbor, William Hogancamp, testified that, on the day that Dunn was killed, he had taken her to see her doctor. According to Hogancamp, Dunn had just gotten out of the hospital after a fall and was having a hard time getting around. He said that, at around 6:30 p.m., he saw a female leave Dunn's apartment. When he asked that female how Dunn was doing, Hogancamp said that she responded: "I'd appreciate it if you [did] not speak to me, my husband is an extremely jealous man." He later saw her leaving with a man who was driving a red truck.

Next, Crute, Huff's wife, took the stand and stated that she had pleaded guilty to killing her sister-in-law by stabbing her to death. When

asked about the events that led to the killing, Crute testified that, on February 9, 2023, she and Huff went to Dunn's apartment because Dunn had just gotten out of the hospital. She said that she was tired and did not want to go but Huff wanted her to go with him.

According to Crute, both she and Huff had used methamphetamine that day, and she said that Huff knew that she had smoked a gram of methamphetamine that day. Although she admitted that methamphetamine sometimes could make her angry, she also stated that it had other effects on her mood as well, including making her "feel good for awhile."

When they got to Dunn's apartment, Crute said, they talked a little and she felt "strange." At some point, Huff offered to pick up food for Dunn at Sharky's Chicken restaurant ("Sharky's"), a local fast-food restaurant. After Huff left, Crute said, she was alone with Dunn. During that time, Crute admitted, she stabbed Dunn three times with a butcher knife that she had in her boot.

When asked about the knife that she used to kill Dunn, Crute admitted that she often carried a knife in her boot and that, that day, she was carrying a "butcher knife" for her protection. Crute explained that

Huff knew that she owned knives but that he did not know that she "had those knives on her." When asked if she could have put the butcher knife she used to kill Dunn in her boot without Huff knowing it, Crute responded: "Yep."[2]

---

[2]I note that the record reflects that the following exchange occurred between Crute and the prosecutor regarding Crute's possession of knives:

"Q: … He also let you keep knives in your house. This isn't the only knife you had in there, was it?

"A: No. I had a whole bunch of knives.

"Q: A whole bunch of knives. And he let you carry them around with you went around places [sic], didn't he?

"A: He let me?

"Q: Yes, ma'am.

"A: He didn't know that I had those knives on me.

"Q: He never knew you carried a knife?

"A: He knew I carried a work knife.

"Q: He never knew you carried other knives?

"A: No.

"Q: You could put that knife on you without his knowing it?

"A: Yep. Put it in my boot."

According to Crute, when Huff returned from Sharky's, she was standing outside of Dunn's apartment. She said that Huff looked in the apartment and then came right back out before transporting her back to their trailer. When they got to their trailer, Crute said that Huff kept telling her to "get out." She also stated that Huff told her that she had 20 minutes to leave before he called the police; however, she noted that Huff did not actually notify the police about what had happened until several hours later.

Crute initially testified that she did not know why she had stabbed Dunn, given that she had no issues with Dunn. However, upon additional questioning, Crute testified about her delusions involving her sister named Rita. She testified that, many years ago, Rita tried to take Huff away from her. She further testified that Rita appeared to her in the form of other people, that Rita was evil, and that she frequently heard Rita's voice. Crute testified that, when she was stabbing Dunn, Dunn asked her if she was trying to kill her and that she responded: "Yes, Rita, I am." (R. 64.) According to Crute, she believed that she was stabbing Rita while she was stabbing Dunn and that it was only afterward that she realized that she had stabbed Dunn. Although Crute admitted that when she

12

heard Rita's voice she got angry and that, in the days leading up to the murder, she had been hearing Rita's voice, she also testified that Huff did not know this.

Finally, when asked if she had ever attacked Huff, Crute admitted that, in 2019, she fired a rifle at Huff five times. During that incident, Crute said that the police came to their house and used tear gas, which led to her surrender. Following that incident, Crute said, she was imprisoned for two years. After she got out of prison, Crute said, she went to live with Huff and the two of them started using methamphetamine.

Dunn's son, Jerry Foxworth, testified that his mother had had a bad fall and was in "real bad shape" on the day she was killed. According to Foxworth, his mother did not like Crute and Huff had told him that Crute was "crazy."

Next, Officer Michael Felder of the Phenix City Police Department testified that he was sent to Huff's house to detain Huff and his wife the day that Dunn was killed. He said that, when he approached Huff, Huff told him that his wife was crazy.

Officer Deon San Nicholas of the Phenix City Police Department testified that he interviewed Huff and Crute at the police station. Officer

San Nicholas said that he read Huff his Miranda[3] rights and that Huff signed a waiver-of-rights form.

Huff then gave a statement that was admitted into evidence during his trial. That statement read, in relevant part:

> "When we got there, I ask my sister if she was doing o.k. from the fall she took at her apartment office. She said that she was hurting and I ask if she wanted me to go get her something to eat. … She wanted chicken wings from Sharky's. She called and ordered. Every time I looked at Rhonda [Crute] she had a wild look on her face. Rhonda went to the bathroom when I left to get the food. When I got back she was standing outside by the parking lot and she said let's go. I said what the heck has happened. Rhonda said that [Dunn] tried to attack her. Then I went and looked in the apartment and seen my sister lying on the floor in a puddle of blood. I ask Rhonda to call the police and she said I'm not going to jail. I said yes you will. Go home she said it wasn't her fault. I said well …. Is it. Then Rhonda came out on the porch at our house and coldly said [she] would do it again."

Huff told Officer San Nicholas that the reason why he took Crute away from the scene and did not call for an ambulance was that he was "in fear because [Crute] had recently tried to shoot him." Huff also told him that Crute "seemed crazy before he left" Dunn's apartment to go get food.

Finally, Lieutenant Robert Isabel of the Phenix City Police Department testified that he was lead investigator on the case and that

---

[3]Miranda v. Arizona, 384 U.S. 436 (1966).

he had collected surveillance footage from Sharky's on the day Dunn was killed. According to Lt. Isabel, the footage showed that Huff was at the restaurant at the time police believed that Dunn had been killed and it appeared that Huff had left Crute alone with Dunn for approximately 22 minutes.

When asked by the prosecution to go over some of the things he learned during his investigation that led to Huff's being charged in the case, Lt. Isabel stated:

"I'll try to piece it together somewhat chronologically. First off, he brought [Crute] to the residence of his sister. He chose to leave [Crute] with his sister alone at that residence knowing the mental state that she was in, knowing that she was under the influence of methamphetamine, knowing that she was having these delusions of shape shifters and talking to people that weren't there, knowing that she was giving his sister these evil looks, that he states, I shouldn't have left her there after I saw her giving these evil looks, I should have known better, knowing that she -- I believe during his initial interview that night of the case he said that he knew she had a box cutter folding knife type of knife on her at all times, so regardless if he knew that she had this 18 inch butcher knife in her boot or not, knew that she was armed in that circumstance, knew that his sister had just got out of the hospital, was unable to defend herself. I think all these actions are reckless. He comes back to the residence. I think it's -- according to the doctor's statements, you know, she may not have been able to be saved if there was an ambulance there or not, but regardless, left his sister there laying in a pool of blood not knowing if she was deceased or not, not calling 9-1-1 for four to five hours later, she was -- I mean --

15

I'm trying to think of what else. And then his statement is, the only thing I'm guilty of here is taking that crazy bitch over there. He made that statement to Investigator [Jose] Silva after the fact, after we charged him. He also acknowledged that it is possible she would have lived if he'd have called 9-1-1, according to himself. Regretted taking her over there because he knew how crazy [Crute] was and even more so on meth, and then, also, he admitted to his nephew that he didn't even know if she was deceased when he decided to leave her there at the residence."

(Emphasis added.)

In May 2023, Huff was indicted for Dunn's murder and for hindering prosecution. In November 2023, Huff was indicted for reckless manslaughter. The State moved for the three charges to be consolidated for trial, and that motion was granted.

After the State rested its case, Huff moved for a judgment of acquittal. He asserted that the State had failed to present a prima facie case of either reckless manslaughter or first-degree hindering prosecution. That motion was denied.

Huff then testified in his own defense. He stated that, on the day Dunn was killed, he had gone with Crute to Dunn's apartment to check on her. Huff said that he usually checked on his sister at least once a week and that he had been doing so more frequently ever since she had been released from the hospital.

16

Although Huff admitted that he took Crute to Dunn's apartment knowing that she was on methamphetamine, Huff also emphasized that he had no reason to think that Crute posed a danger to Dunn because Crute had never threatened to hurt Dunn before and that, to his knowledge, she did not have anything against Dunn. Rather, Huff said, the only person Crute had ever been violent toward was him, and he mentioned the 2019 incident during which, he admitted, Crute shot at him multiple times.

Huff then testified that, after they arrived at Dunn's apartment, he offered to go get her some food from Sharky's. He said that, before he left, he noticed that Crute had a weird look on her face and that, when he asked her what was wrong, she told him she had a toothache. Huff said that he did not know that Crute had a knife in her boot when he left the two of them alone that day.

According to Huff, when he returned from Sharky's with the food, he saw Crute outside of Dunn's apartment. Crute told him that Dunn had attacked her and that she wanted to leave. Huff said that he stepped into Dunn's apartment and then immediately stepped back outside when he saw his sister in a pool of blood. He then took Crute back to their trailer

17

where, he said, she told him that she would do it again. When asked why he did not call 911 after finding his sister, Huff said that he was "on drugs" and he panicked.

When asked about Crute's history of mental-health issues, Huff admitted that he knew that she had had mental-health issues dating back to the 1970s but that she had been taking medications to help with those issues. However, around the time of the murder, Huff said, he thought that she had not refilled those medications. When asked about Crute's delusions concerning her sister Rita, Huff stated that Crute is "a crazy bitch" that hears and sees things that are not there, but he said that Crute never told him that she wanted to kill "Rita."

After all the evidence was presented, Huff renewed his motion for a judgment of acquittal. At that time, he asserted that the evidence "is clear that although [Huff] drove his wife to the scene of the crime, he had no knowledge, scheme or plan, nor did he intend to cause the death of the victim and that the evidence is undisputed that [Huff] was not present during the crime."

The trial court dismissed the murder charge after finding that the State had failed to present sufficient evidence of that offense; however, it

submitted the reckless-manslaughter and hindering-prosecution charges to the jury. As explained above, the jury convicted Huff of both offenses. After he was sentenced, Huff appealed his convictions and sentences to the Court of Criminal Appeals. He thereafter petitioned this Court for a writ of certiorari to review the Court of Criminal Appeals' decision affirming his convictions and sentences.

## Standard of Review

As stated previously, we granted certiorari review to consider, as a material question of first impression, whether a defendant can be independently convicted of reckless manslaughter under § 13A-6-3(a)(1) even though he or she is not the actual person who committed the act that resulted in a victim's death. This is a legal question, and it is well settled that "'"[t]his Court reviews pure questions of law in criminal cases de novo."'" Ex parte Holbert, 4 So. 3d 410, 412 (Ala. 2008) (quoting Ex parte Morrow, 915 So. 2d 539, 541 (Ala. 2004), quoting in turn Ex parte Key, 890 So. 2d 1056, 1059 (Ala. 2003)).

In addition to considering that legal question, however, we are also reviewing whether the law was properly applied to the sufficiency-of-the-evidence question raised by Huff on direct appeal to the Court of Criminal

19

Appeals. Our Court has previously stated that the standard of review for a ruling on a motion for a judgment of acquittal that challenges the sufficiency of the evidence is

> "'"'whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" Nunn v. State, 697 So. 2d 497, 498 (Ala. Crim. App. 1997), quoting O'Neal v. State, 602 So. 2d 462, 464 (Ala. Crim. App. 1992). "'When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.'" Farrior v. State, 728 So. 2d 691, 696 (Ala. Crim. App. 1998), quoting Ward v. State, 557 So. 2d 848, 850 (Ala. Crim. App. 1990). "The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." Ex parte Bankston, 358 So. 2d 1040, 1042 (Ala. 1978).'"

Ex parte Stewart, 900 So. 2d 475, 477 (Ala. 2004) (quoting Webster v. State, 900 So. 2d 460, 463 (Ala. Crim. App. 2004)).

## Discussion

Huff contends that the Court of Criminal Appeals erred in affirming his reckless-manslaughter conviction for two reasons. First, he contends that he should not have been convicted of reckless manslaughter because he "did not legally cause" Dunn's death; rather, he contends, Crute acted "of her own free will" in murdering Dunn.

20

Second, Huff contends that he should not have been convicted of reckless manslaughter because he did not act recklessly by bringing Crute with him to visit his sister on the day she was killed. Although he acknowledges that he knew that Crute had a history of violence, substance abuse, and mental-health issues, Huff contends that he could not have known that Crute was a danger to Dunn because Crute had never threatened to hurt Dunn before and, to his knowledge, did not have anything against Dunn.

In response, the State argues that no reasonable person in Huff's situation would have taken Crute to see his ailing sister knowing that she had a history of violence and mental-health issues. In particular, the State notes that Huff knew that Crute had taken methamphetamine the day they went to see Dunn and that she became angry whenever she used that drug. The State also notes that Huff was aware that Crute had a history of violence and had even tried to shoot and kill him on a prior occasion. The State further notes that Crute had a history of seeing visions of her sister, Rita, that she wanted to kill Rita, and that she called out Rita's name when she stabbed Dunn. Taken together, the State contends that sufficient evidence was presented during Huff's trial below

21

to show that he caused Dunn's death by consciously disregarding the substantial risk that Crute posed to Dunn given her mental state and history of violence when he took her over to Dunn's apartment and left Crute there alone with her. It is for these reasons that the State contends that Huff is due no relief.

I. Underlying Legal Authorities -- Statutes and Caselaw

A. Section 13A-6-3, Ala. Code 1975 -- Alabama's Reckless-Manslaughter Statute

Under § 13A-6-3(a)(1), Ala. Code 1975, a person commits the crime of reckless manslaughter if "[h]e recklessly causes the death of another person."[4] Section 13A-2-2(3), Ala. Code 1975, defines "recklessly" as follows:

> "A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."

(Emphasis added.)

---

[4]I quote the version of § 13A-6-3(a)(1) in effect at the time of Dunn's death.

"For reckless manslaughter, defining recklessness is highly fact sensitive, requiring consideration of whether defendant was aware of, but consciously disregarded, a substantial and unjustifiable risk to human life, such as would constitute a gross deviation from the standard of care owed to others." Jennifer A. Brobst, Criminal Offenses and Defenses in Alabama § 4:4 (2023)(footnote omitted).[5]

Because there is no dispute that Crute was the one who actually murdered Dunn, under the statutes quoted above, the key questions in this case are whether Huff could independently be convicted of reckless manslaughter for causing Dunn's death by bringing Crute to his sister's home knowing that Crute had a history of violence and mental-health issues and whether having such knowledge meant that he consciously

_____

[5]See also Ex parte Koppersmith, 701 So. 2d 821 (Ala. 1997) (upholding defendant's conviction for reckless manslaughter for the death of his wife after he beat her and threw her off of their porch, in a case in which the jury was charged on murder, reckless manslaughter, and criminally negligent homicide); Jones v. State, 217 So. 3d 947 (Ala. Crim. App. 2016) (finding sufficient evidence of recklessness when defendant strangled victim); Thompson v. State, 97 So. 3d 800 (Ala. Crim. App. 2011) (finding sufficient evidence to uphold a conviction for manslaughter when bruising and other evidence indicated a physical altercation had occurred just before the shooting that caused the victim's death); Ashley v. State, 651 So. 2d 1096 (Ala. Crim. App. 1994) (finding reversible error in a capital-murder case for failure to provide a manslaughter jury instruction when death occurred during a burglary).

23

disregarded a substantial risk that Crute could have posed a danger to Dunn.

Although our Court has previously recognized that a person can be convicted of reckless manslaughter as <u>an accomplice</u> if there is evidence that the individual's conduct "aided and encouraged another who was aware of, and who consciously disregarded, a substantial risk of death," <u>see</u> <u>Ex parte Simmons</u>, 649 So. 2d 1282, 1285 (Ala. 1994), there is very little Alabama caselaw -- including none from our Court -- addressing the circumstances under which a person can be found <u>independently</u> guilty of reckless manslaughter for the death of another person even though he or she was not the actual person that caused the victim's death. However, it appears that the Court of Criminal Appeals has done so and, in fact, has developed a framework over time for deciding the question now before us using the statutes discussed above.

<u>B.</u> Lewis v. State<u>, 474 So. 2d 766 (Ala. Crim. App. 1985)</u>

For example, a variation of this question was first considered by the Court of Criminal Appeals in the context of a criminally-negligent-homicide conviction in <u>Lewis v. State</u>, 474 So. 2d 766 (Ala. Crim. App. 1985). In that case, the victim shot himself after having played Russian

24

roulette earlier in the day with the defendant. The defendant was charged with murder in connection with the victim's death but was convicted of criminally negligent homicide, see § 13A-6-4(a).

On appeal, the defendant argued that his conviction for criminally negligent homicide was due to be overturned because, he said, there was not sufficient evidence presented at trial to sustain his conviction. Specifically, he argued that his acts were not the proximate cause of the victim's death.

In addressing the defendant's argument, the Court of Criminal Appeals first noted that, under § 13A-6-4(a), "'[a] person commits the crime of criminally negligent homicide if he causes the death of another person by criminal negligence.'" 474 So. 2d at 770. That court further noted that, under § 13A-2-2(4),

> "'[a] person acts with criminal negligence with respect to a result or a circumstance which is defined by statute as an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.'"

Id.

The Court of Criminal Appeals then explained that, because the

25

evidence was clear "that the deceased either committed suicide or fell victim to an unfortunate misadventure," that court was faced with the following question: "'When may one human being be held criminally liable for the self-destruction of another?'" Id. (quoting Brenner, Undue Influence in the Criminal Law: A Proposed Analysis of the Criminal Offense of "Causing Suicide," 47 Albany L. Rev. 62, 63 (1982)). In answering this question, the Court of Criminal Appeals explained that, in Alabama, "'[a] person is criminally liable if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was sufficient to produce the result and the conduct of the actor clearly insufficient.'" Id. (quoting § 13A-2-5(a), Ala. Code 1975). That court further explained that "'[t]he problem lies, of course, in determining when, and if, an accused did in fact cause his alleged victim to commit suicide. This difficult determination requires proof that the suicide was caused by the accused's actions and was not the result of the victim's own free will.'" Id. (quoting Brenner, supra, at 63).

In reversing the defendant's conviction, the Court of Criminal Appeals determined that the victim's conduct was a "supervening,

26

intervening cause sufficient to break the chain of causation" because it occurred (1) after the Russian roulette game had ended and after the defendant had put the gun away and (2) the defendant was not present when the victim shot himself. Id. at 771. In particular, the Court of Criminal Appeals held that, "[e]ven though the victim might never have shot himself in this manner if the [defendant] had not taught him to play Russian [r]oulette, we cannot say that the [defendant] should have perceived the risk that the victim would play the game by himself or that he intended for him to do this." Id. (emphasis added). Although the Court of Criminal Appeals acknowledged that the case presented "a tragic situation" and made clear that it did not "condone the [defendant's] conduct[] in any manner," it explained that "the causal link between the [defendant's] conduct and the victim's death was severed when the victim exercised his own free will" and, therefore, held that "this case must be reversed and this cause rendered." Id.

## C. Grant v. State, 324 So. 3d 887 (Ala. Crim. App. 2020)

After Lewis, supra, it appears that the next time the Court of Criminal Appeals addressed this question was in Grant v. State, 324 So. 3d 887 (Ala. Crim. App. 2020), the case on which that court relied below

27

in affirming Huff's reckless-manslaughter conviction.

There, the defendant, Terri Lynn Grant, was convicted of reckless manslaughter over her involvement in the death of Khaled Almashni at the hands of Jordan Daniel Johnson. On the day Almashni was murdered, Johnson went to Grant's house at her request and told her that she "'had crossed him'" and that either "'[she] was gonna die, or [Almashni] was gonna die.'" 324 So. 3d at 891 (quoting State's Exhibit 94, at 1:55:18-31). Johnson then told Grant that she "'could either get in the car and take him to [Almashni]'" so that he could kill Almashni or he would kill her. Id. (quoting State's Exhibit 94, at 2:05:38-47). Grant then drove Almashni to Johnson's apartment.

According to Grant, when she and Johnson arrived at Almashni's apartment, she opened the door and saw Almashni sleeping in the living room. When Almashni got up, Grant said that she "'just heard a shot and [she] took off running'" toward her truck. Id. (quoting State's Exhibit 94, at 2:09:06-15).

After Grant was convicted of reckless manslaughter, she appealed her conviction to the Court of Criminal Appeals. On appeal, Grant's only argument was that the trial court had erred by submitting the reckless-

manslaughter charge to the jury when, she said, "'there was no rational evidentiary basis'" for such a charge. Id. at 893 (quoting Grant's brief at 38).

After reciting the elements of the reckless-manslaughter offense from the Criminal Code that I have quoted above, see § 13A-6-3(a)(1), and § 13A-2-2(3), the Court of Criminal Appeals explained that the legal propriety of a reckless-manslaughter charge in Grant's case rested on "(1) whether Grant was complicit in Johnson's act of killing Almashni or (2) whether Grant was independently reckless to the point of committing manslaughter herself." Id. at 894.

After concluding that Grant could not be convicted of reckless manslaughter under a complicity theory, the Court of Criminal Appeals proceeded with addressing the second question. In addressing the causation element of the offense, the Court of Criminal Appeals, quoting from and citing Lewis, supra, explained as follows:

> "'Section 13A-2-5(a), Ala. Code 1975, provides that "[a] person is criminally liable if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was sufficient to produce the result and the conduct of the actor clearly insufficient." The Commentary to § 13A-2-5 explains that
>
> "'"this section is a modified 'but for' test, with an

29

express exclusion of those situations in which the concurrent cause was clearly sufficient to produce the result and the defendant's conduct clearly insufficient .... If the actual result is not within the contemplation of the actor, or within the area of risk of which he should have been aware, he is not deemed to have 'caused' the result. But if the difference is only one concerning which person or what property would be affected by defendant's act, or one of the degree of harm which would result, he is still held to have 'caused' the result."

"'The accused's conduct is not the cause-in-fact of an injury if there was an <u>unforeseen</u> "supervening, intervening cause sufficient to break the chain of causation." <u>Lewis v. State</u>, 474 So. 2d 766, 771 (Ala. Cr. App. 1985).'"

<u>Id.</u> at 897 (quoting <u>Pearson v. State</u>, 601 So. 2d 1119, 1126 (Ala. Crim. App. 1992)).

Again, citing and quoting from <u>Lewis</u>, <u>supra</u>, the Court of Criminal Appeals then explained that foreseeability is the key issue in a causation inquiry in a reckless-manslaughter case:

"'The "controlling question[]" is "whether the ultimate result was foreseeable to the original actor." <u>Henderson v. Kibbe</u>, 431 U.S. 145, 151 n.9, 97 S. Ct. 1730, 1735 n.9, 52 L. Ed. 2d 203 (1977). <u>If the accused "should have perceived" that his own conduct would concur with another cause to bring about the injury to the victim, then the other cause is concurrent, not supervening.</u> See <u>Shirah v. State</u>, 555 So. 2d 807, 812-13 (Ala. Cr. App. 1989) (conduct of accused, who supplied morphine to victim, was the cause-in-fact of victim's death from overdose of Secobarbital and morphine combined). On the other hand, a supervening cause "breaks the chain of

causation" precisely because it is not a reasonably foreseeable result of the accused's conduct. <u>Lewis</u>, 474 So. 2d at 771 .'"

<u>Id.</u> at 898 (quoting <u>Pearson</u>, 601 So. 2d at 1127).

Applying the foregoing legal principles to the evidence in Grant's case, the Court of Criminal Appeals held that the State presented sufficient evidence to support the trial court's decision to submit the reckless-manslaughter charge to the jury. In support of its holding, that court first explained: "In this case, it was undisputed that Johnson did not know where Almashni lived. Thus, it is clear that, but for Grant taking Johnson to Almashni's apartment, Almashni would not have been murdered by Johnson on March 26, 2016." <u>Id.</u>

Next, the Court of Criminal Appeals explained that Grant was <u>specifically</u> on notice that Johnson wanted to harm Almashni and that, therefore, it was "foreseeable" that the murder might occur because "<u>Grant knew Johnson was armed</u> at that time" and because Grant drove Johnson to Almashni's apartment <u>after Johnson told her that he intended to kill Almashni</u>." <u>Id.</u> (emphasis added). Thus, because Johnson would not have been in a position to kill Almashni but for Grant's taking him to Almashni's apartment and because it was foreseeable that Johnson would kill Almashni if given the opportunity, the Court of Criminal

31

Appeals held that Grant's act of taking Johnson to Almashni's apartment was a cause in fact of Almashni's death. Id. That court then explained that, because the killing was a foreseeable result of Grant's actions, Johnson's actions did not "break the chain of causation" and, therefore, were not an "unforeseen" "supervening" cause of Almashni's death. Id.

The Court of Criminal Appeals also explained, however, that the analysis did not stop with whether Grant's conduct was a cause in fact of Almashni's death. Specifically, it explained that there must also be evidence that Grant's conduct was sufficiently "reckless" in order to sustain her conviction for that offense. 324 So. 3d at 899. Because it was undisputed that Johnson did not know where Almashni lived, and because there was evidence indicating that Grant knew Johnson was angry with Almashni, that Grant knew Johnson was armed, that Johnson had told Grant he intended to kill Almashni, and that, despite those facts, Grant drove Johnson to Almashni's apartment, the Court of Criminal Appeals held that, "by leading Johnson to Almashni's apartment under such circumstances, Grant was 'aware of and consciously disregard[ed] a substantial and unjustifiable risk' that Almashni would be killed." Id. (quoting § 13A-2-2(3)) (emphasis added).

That court further explained that the conscious disregard of such a substantial risk "'constitute[d] a gross deviation from the standard of conduct that a reasonable person would observe in [Grant's] situation.'" Id. (quoting § 13A-2-2(3)). In support of that conclusion, it explained that it did "not believe a reasonable person would have taken Johnson to Almashni's apartment under the circumstances set forth above because doing so provided Johnson, who did not know where Almashni lived, with the opportunity to kill Almashni by, in a manner of speaking, leading the slaughterer to the lamb." Id. Based on the foregoing, the Court of Criminal Appeals affirmed Grant's reckless-manslaughter conviction.

II. Putting it All Together -- How the Above Statutes and Caselaw Help Us Answer the Question Now Before Us

In my view, the above statutes and caselaw correctly articulate under what circumstances a defendant can be convicted of reckless manslaughter even when he or she is not the actual person who committed the act that resulted in the victim's death. Stated simply, the above authorities all make clear that, for a defendant to be independently convicted of reckless manslaughter, two elements must be met. First, the defendant must have reasonably foreseen that his or her conduct would operate concurrently with the conduct of another and then result in the

33

victim's death. Second, the defendant must have been aware of, and have consciously disregarded, a substantial and unjustifiable risk that the victim's death would occur and the defendant's disregard of that risk must be so great that his or her failure to recognize it is a gross deviation from the standard of conduct that a reasonable person would have observed in the defendant's situation.

### III. Applying the Foregoing Legal Principles to Huff's Case

Relying on the facts from <u>Grant</u>, <u>supra</u>, the Court of Criminal Appeals held that the jury correctly found beyond a reasonable doubt that Huff put into motion a chain of events that resulted in Dunn's death by bringing Crute to visit Dunn. It further held that Huff consciously disregarded the risk of his actions because he knew that Crute had a history of violence, substance-abuse issues, and mental-health issues. Accordingly, that court affirmed Huff's reckless-manslaughter conviction.

Although <u>Grant</u> certainly provides a helpful framework for answering the question now before us, that case is distinguishable from the present case because, here, there is no evidence that Huff's conduct was sufficiently reckless so as to sustain his conviction for that offense.

For example, in <u>Grant</u>, there was evidence indicating that Grant knew that Johnson was angry at Almashni. She also knew that he had a specific intent to harm Almashni because she knew that Johnson was armed and he had told her that he was going to kill Almashni. Despite being aware of the specific risk that Johnson posed to Almashni's life, Grant took Johnson to Almashni's apartment anyway, thus setting into motion the events that led to Almashni's death.

Here, although Huff was the one who took Crute to Dunn's apartment that day, the similarities with <u>Grant</u> stop there. Unlike in <u>Grant</u>, Huff was not physically present when Crute killed Dunn. Also, unlike in <u>Grant</u>, where the defendant knew that Johnson had specifically announced his intent to kill Almashni, the evidence presented during Huff's trial indicated that Crute did not say or do anything before their arrival at Dunn's apartment that would have made Huff <u>aware</u> that she might kill Dunn. Crute testified that she had no issues with Dunn. While Huff admitted that Crute had a "strange look" on her face when he left to go to Sharky's, he also stated that he asked Crute if she was okay and that she told him that she had a toothache.

Huff further testified that he was the only person toward whom

Crute had ever been violent, and that violence had occurred several years earlier. Although Huff admitted that he knew that Crute had taken methamphetamine on the day they visited Dunn, and although Crute stated that the drug could make her angry, Crute also testified that methamphetamine had other effects on her mood, including making her "feel good for awhile." Finally, Huff testified that Crute had never shown any animosity or aggression toward Dunn, which would have included while all three were in Dunn's apartment together on that day after Crute had taken methamphetamine. All of this evidence indicates that Huff was not "aware of and consciously disregard[ed] a substantial and unjustifiable risk" that Crute would kill Dunn in the 22 minutes while he went to Sharky's. § 13A-2-2(3) (emphasis added).

The State contends, however, that there was further evidence presented during Huff's trial that indicated that he was consciously aware of the substantial and unjustifiable risk that Crute posed to his sister's life that day, including her propensity for carrying a knife and her hallucinations. For instance, the State notes that Crute testified that she was seeing visions of her sister Rita, whom she had previously said that she wanted to kill. The State also notes that Huff told law-

36

enforcement officers that he regretted taking Crute to Dunn's apartment because he knew that Crute was "crazy."

However, there was no evidence indicating that Huff was aware that Crute had a weapon on her that day or that she had been seeing visions of Rita. Huff expressly testified that he was unaware that, in the days leading up to the murder, Crute had been hearing voices and "seeing" her sister, Rita. Crute confirmed this to be true during her testimony. Moreover, as noted above, Crute specifically testified that Huff was unaware that she had the butcher knife with her on the day of the murder. (R. 70-71.) ("Q. You could put that knife on you without his knowing it? A. Yep. Put it in my boot.").

In my view, the facts in this case more closely resemble the facts in Lewis, supra. In that case, the defendant's criminally-negligent-homicide conviction was overturned. The Court of Criminal Appeals held that, "[e]ven though the victim might never have shot himself in this manner if the [defendant] had not taught him to play Russian [r]oulette," it could not "say that the [defendant] should have perceived the risk that the victim would play the game by himself or that he intended for him to do this." Lewis, 474 So. 2d at 771. The same can be said in the present case.

Like in <u>Lewis</u>, Huff was not physically present when Crute stabbed Dunn. He also did not suggest or participate in Dunn's murder. In fact, the evidence presented during Huff's trial undisputedly showed that he was unaware that Crute had killed Dunn until after he returned from Sharky's. Further, like in <u>Lewis</u>, Huff did not own or otherwise supply the weapon that Crute used to kill Dunn. He also did not know that it was in Crute's possession when they went to visit Dunn. Finally, the facts here are even weaker than in <u>Lewis</u>, because <u>Lewis</u> involved a <u>prior</u> game of Russian roulette while, in this case, there had not been any prior incident between Crute and Dunn that could have foreshadowed what was about to happen. Once again, the evidence presented during Huff's trial showed that his only alleged wrongdoing was bringing his wife to Dunn's apartment and leaving her there with Dunn for 22 minutes.

To the extent that it might be argued that Huff's statements to law-enforcement officers support a reckless-manslaughter conviction, I disagree. It is true that Huff expressed deep regret for the stabbing of his sister and blamed himself for taking his wife to his sister's apartment that day. <u>See, e.g.</u>, R. 244 ("I shouldn't have left her there after I saw her giving these evil looks, <u>I should have known</u> better") (emphasis added).

38

Perhaps such regret might (or might not) be sufficient evidence to support a conviction for criminally negligent homicide, which, our Court has explained, involves a defendant who disregarded a risk of which he or she "should have been aware." Ex parte Koppersmith, 701 So. 2d 821, 822 (Ala. 1997). It is not, however, sufficient to support a conviction for reckless manslaughter, which, as explained repeatedly throughout this writing, requires the defendant to "'"consciously disregard[]" a substantial and unjustifiable risk.'" Id. (quoting Weems v. State, 463 So. 2d 170, 172 (Ala. 1984) (explaining fully the differences between "depraved heart" murder under § 13A-6-2(a)(2), reckless manslaughter under § 13A-6-3(a)(1), and criminally negligent homicide under § 13A-6-4(a)))(emphasis added). Thus, evidence of what Huff "should have known" or "should have been aware" of is not sufficient for a reckless-manslaughter conviction. Instead, there must be evidence of a "substantial and unjustifiable risk" that he "consciously disregarded." For the reasons stated above, there simply is no evidence of this in this case.

The State also argues that, after the murder, Huff did not seem sufficiently upset about his sister's death and that he did not render aid

39

when he saw her lying on the floor of her apartment in a pool of blood. State's brief at 10 n.2 (noting that Huff "'didn't seem upset'" but that he seemed "'matter-of-fact'" and did not inquire about whether Dunn was dead during his contact with police). But the State never explains why Huff's behavior <u>after</u> the murder is relevant to whether Huff "consciously disregarded" a "substantial and unjustifiable risk" <u>before</u> the murder.

Based on the foregoing, I believe that there was insufficient evidence from which a rational finder of fact could have found that Huff was "aware of and consciously disregard[ed] a substantial and unjustifiable risk" that Crute would kill Dunn. § 13A-2-2(3). To conclude otherwise would mean that Huff (or anyone in his situation) could be convicted of reckless manslaughter if he took his wife <u>anywhere</u> and she murdered <u>anyone</u>. This simply is not consistent with the statutes and caselaw discussed above. Because the evidence presented below was insufficient to satisfy the second element of a reckless-manslaughter offense, I need not address if the first element -- that is, whether Huff could have reasonably foreseen that his conduct in bringing his wife to Dunn's apartment caused Dunn's death -- was met.

<u>Conclusion</u>

In sum, because I believe that Huff could not have reasonably foreseen Dunn's death at the hands of Crute, <u>see</u> <u>Lewis</u>, <u>supra</u>, I respectfully dissent from the decision to quash the writ.

Stewart, C.J., and Sellers, J., concur.